NOT RECOMMENDED FOR PUBLICATION

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

Eastern District of Kentucky
FILED
DEC - 2 2009
AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

| | |
|---|---|
| UNITED STATES, | ) |
| Plaintiff, | ) Criminal No. 09-01-01-JSS |
| v. | ) **MEMORANDUM OPINION & ORDER** |
| JOHN DAVID PINKE, | ) |
| Defendant. | ) |

JEFFREY S. SUTTON, Circuit Judge.[1]

John David Pinke stood trial for assault with intent to murder and possession of a shank in prison. When Pinke sought to call the victim of his assault to testify that Pinke never intended to kill him, the court sustained the government's objection, promising that it would explain its reasoning further in a forthcoming opinion. This is that opinion.

I.

On November 14, 2008, John David Pinke and Russell Oehlson set upon Aaron Pike with prison-made knives (shanks) in a hallway of the United States Penitentiary, Big Sandy, where all three were inmates. By the time the attack was over, Pike had stab wounds on his head and across his upper back and shoulders. Pike managed to walk away from the scene, but both of his lungs

---

[1] Circuit Judge, the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Criminal No. 09-01-JSS
*United States v. Pinke*

were punctured in the attack, and only the arrival of immediate medical assistance saved him from a premature death.

A grand jury indicted Pinke and Oehlson for assault with intent to murder and for possession of a shank in prison. Indictment, R.1 (Jan. 15, 2009); *see* 18 U.S.C. § 113(a)(1); *id.* § 2; *id.* § 1791(a)(2), (b)(3). Oehlson pleaded guilty, but Pinke proceeded to trial. Conceding that Pinke had possessed a shank and assaulted Pike—one could not reasonably have argued otherwise, since the government presented video footage showing Pinke doing exactly that—the defense argued that Pinke never intended to murder Pike, only to rough him up.

For its part, the United States introduced testimony from: corrections officials who played and described the video recording to the jury; guards who had seen the incident and further explained what the video showed; and medical professionals who had treated Pike and described the location and seriousness of Pike's wounds. The defense cross-examined each of the government's witnesses with an eye to emphasizing Oehlson's role and downplaying Pinke's. To this end, the defense elicited from the guards that Oehlson had struck many of the blows at the top of Pike's back, and that (for at least some portion of the attack) Pinke had struck him only in the stomach; the defense then elicited from the medical professionals that none of the serious stab wounds were on Pike's stomach.

After the government rested, the defense called Oehlson. He told the jury that he had planned the attack by himself and that he had merely brought Pinke along—admittedly giving him

Criminal No. 09-01-JSS
*United States v. Pinke*

a shank in the process but telling him they were only going to beat Pike up and might need the shanks in case Pike had one of his own. Oehlson testified that he had met Pike the day before the assault, that neither he nor Pinke had ever spoken with Pike and that Pinke did not know who Pike was. He added that, during the incident, he saw Pinke only punch Pike, not stab him, and that Pinke held the shank with the blade up against his arm while he was doing so.

The defense sought to subpoena Pike himself and to put him on the stand after Oehlson testified. The defense proposed to ask Pike whether he thought Pinke was trying to murder him. Counsel for the United States informed the court that Pike did not want to testify and contended that putting him on the stand and forcing him publicly to refuse to testify would be akin to forcing a witness to assert the Fifth Amendment in front of the jury. *Cf., e.g., United States v. Castro*, 129 F.3d 226, 231 (1st Cir. 1997). Arguing that such a situation would be unfair to Pike, the government also cited 18 U.S.C. § 3771(a), which provides certain rights for crime victims, including "[t]he right to be reasonably protected from the accused," *id.* § 3771(a)(1), and "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy," *id.* § 3771(a)(8).

After a recess, the court held a conference out of the presence of the jury to clarify each party's position. Counsel for the defense said he wanted to ask Pike just one question: Did Pike think Pinke was trying to murder him? If the answer was no, the defense would rest; if the answer was yes, the defense would impeach Pike with a statement from another inmate, Mooney, to the effect that Pike had told Mooney that he thought Pinke had not intended to kill him. The court

Criminal No. 09-01-JSS
*United States v. Pinke*

sustained the government's objection, though not necessarily each of its explanations, and promised to provide a memorandum laying out its thinking.

II.

The government's first contention—that the victims' rights provisions of 18 U.S.C. § 3771 limit Pinke's ability to call Pike—does not by itself provide a basis for excluding the testimony. Section 3771 grants crime victims the rights, among others, "to be reasonably protected from the accused" and "to be treated with fairness and respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(1), (a)(8). To the extent § 3771 might allow a victim to avoid testifying in a criminal trial—no court opinion to my knowledge has considered the possibility—that right must yield to the defendant's right to compel the testimony of witnesses in his favor. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."); *Taylor v. Illinois*, 484 U.S. 400, 408 (1988).

But the Sixth Amendment right to compel the testimony of witnesses is not absolute. It extends only to *admissible* testimony. *Taylor*, 484 U.S. at 410. The question, then, is less about what § 3771 requires and more about whether the Rules of Evidence permit the compelled testimony. For the reasons that follow, Pike's proposed testimony is inadmissible.

The defense proffered that Pike would testify that, in his opinion, Pinke never meant to kill him. Rule 701 permits such lay opinion testimony to the extent that it is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness' testimony or the

-4-

Criminal No. 09-01-JSS
*United States v. Pinke*

determination of a fact in issue." Fed. R. Evid. 701(a), (b). The first criterion addresses the standard foundational requirement that (non-expert) witnesses must base their testimony upon first-hand, personal knowledge. *See* Fed. R. Evid. 602; Fed. R. Evid. 701 advisory committee's note (This "[l]imitation . . . is the familiar requirement of first-hand knowledge or observation."). The second criterion calls for the court to make a more wide-ranging inquiry into whether the testimony would be "helpful"—a lay-testimony equivalent to the inquiry Rule 702 requires judges to make into whether proposed expert testimony would "fit" the issue at hand. *Cf. Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (requiring judges to assess the appropriateness of expert testimony according to Rule 702's requirement that such testimony "assist the trier of fact to understand the evidence or determine a fact in issue," Fed. R. Evid. 702).

In practice, however, these criteria cannot be separated, because the basis of a witness's opinion often determines the helpfulness of the testimony. If a handful of discrete facts form the basis of the opinion, then the witness would be most helpful by simply stating those facts and allowing the jury to form its own opinion. *See United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992). This is especially true when a witness leaps from specific facts to an opinion on an ultimate issue, for such an opinion most threatens to invade the province of the jury. *See Mitroff v. Xomox Corp.*, 797 F.2d 271, 276–77 (6th Cir. 1986) ("[S]eldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness'."); *see also Hester v. BIC Corp.*, 225 F.3d 178, 181–82 (2d Cir. 2000) ("[T]he costs of lay opinion increase and the benefits diminish the closer the opinion approaches the crucial issues

Criminal No. 09-01-JSS
*United States v. Pinke*

in the case." (quoting 29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6255)).

Contrast the opinion about a person's state of mind founded on repeated observations of the person over time. That sort of opinion is often the soundest, yet the hardest to articulate, on the matter at hand, and for these reasons it is more likely to be "helpful" in the way the Rules envision. *See Rea*, 958 F.2d at 1216 ("Lay opinion testimony [about the defendant's state of mind] will probably be more helpful when the inference of knowledge is to be drawn not from observed events or communications that can be adequately described to the jury, but from such factors as the defendant's history or job experience."). Few have either the memory or the powers of reflection to think, for instance, "Over the five years I've known the defendant, seventeen facts have shaped my opinion of him. First, . . . . Second, . . . , etc." Allowing a witness to state an opinion in such a circumstance is more likely to be helpful to the jury than forcing the witness either to elaborate the opinion's predicate facts or to stay quiet. *See United States v. Skeet*, 665 F.2d 983, 985–86 (9th Cir. 1982) ("Opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion."); Edward J. Imwinkelried, *The Taxonomy of Testimony Post-Kumho: Refocusing on the Bottomlines of Reliability and Necessity*, 30 Cumb. L. Rev. 185, 194 (2000) (The Rules allow lay opinion testimony when "it is literally or virtually impossible for the witness to verbalize the primary data."). Through it all, a court must tread particularly carefully when applying

Criminal No. 09-01-JSS
*United States v. Pinke*

Rule 701 to an opinion of a defendant's intent, for "no man can know the secret purposes of a man's heart except himself." *Fisk v. Inhabitants of Chester*, 74 Mass. (8 Gray) 506, 508 (1857).

Gauged by these considerations, the proffered opinion testimony fails to satisfy the requirements for admission. In attempting to force Pike, the victim of the assault, to testify, the defense proposed one opinion-related question—Did Pike think that Pinke intended to kill him?—and argued that Pike could have formed such an opinion because he experienced the attack itself. If Rule 701 required just first-hand perception and left it at that, the defense might well be able to present the testimony because Pike in one sense perceived Pinke's attack in the most direct way possible: by suffering through it himself.

But such an opinion would not necessarily be "helpful" to the jury, which Rule 701 also requires. Fed. R. Evid. 701(b). If Pinke, say, had punched Pike rather than stabbing him, that might form a sound basis for an opinion of Pinke's intent. But testimony about the manner of the assault would make it unnecessary to introduce *an opinion based on* the punching; the jury could have made up its own mind regarding what punching versus stabbing signified about Pinke's intent. *See Mitroff*, 797 F.2d at 276–77. Yet here, most notably, the defense conspicuously *did not* proffer that Pike would testify to the fact that Pinke punched rather than stabbed Pike or for that matter about any other detail of the manner of attack. Instead, the defense repeatedly limited its proffer to Pike's opinion. One cannot blame the defense for so limiting the proffer: There was after all a vivid video account of the manner of the attack. Nor could the defense have proffered the sort of foundation that might have made this sort of opinion testimony most helpful—a long experience observing and

interacting with Pinke. *See Rea*, 958 F.2d at 1216. As Oehlson testified, Pike and Pinke had never even seen each other before the incident.

When all is said and done, the defense wanted Pike, a fellow inmate and the victim of the attack, to take sides on the issue of Pinke's guilt, but that would not be helpful. *See* Fed. R. Evid. 701, advisory committee's note ("If . . . attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule."); *Mitroff*, 797 F.2d at 276 (such testimony turns the witness "into little more than an 'oath helper'"). And that unhelpfulness looms large in a situation like this one: where the witness does not want to testify, where any opinion he gives runs the risk of having less to do with his impression of the attack and more to do with the witness's fear of retribution and where the best foundation for establishing the defendant's state of mind—a clear video depiction of the entire assault—was already before the jury.

### III.

For these reasons, the court has sustained the government's objection to calling Aaron Pike as a witness.

*/s/ J.S. Scott*